WICKER, J.
I rThis appeal arises out of a judgment of the district court denying plaintiff Frederick E. Yorsch’s request for a preliminary injunction to restrain defendant, Stephen D. Morel, from undertaking various employment activities with several alleged competitors of Nola Title Company, L.L.C. and My Tax Sale Resources, L.L.C. (the “Companies,” collectively)—two member-managed limited liability companies of which Yorseh and Morel are the only two members—and from soliciting or targeting clients of the Companies. Through his “Verified Petition for Temporary Restraining Order, Preliminary Injunction and Permanent Injunction,” Yorseh sought enforcement of a “Non-Circumvention and Non-Competition Agreement” (the “Agreement”) into which Yorseh and Morel entered as members of the Companies. As indicated by its title, the Agreement contained both a non-competition clause and a non-circumvention clause. On the merits, Yorseh argues that, each clause independently entitles him to injunctive relief. After a careful review of the Agreement and of the applicable law, we hold that both clauses are unenforceable on their face. Because we find the scope of the non-competition clause to be impermissibly broad and because we find that the non-circumvention agreement is not geographically bound as required by La. R.S. 23:921, we affirm the district court’s judgment.
FACTUAL AND PROCEDURAL BACKGROUND
On April 19, 2006, Yorseh and Morel formed Nola Title Company, L.L.C. (“Nola Title”), a member-managed limited liability company, to offer closing and title insurance services for the sale of properties.[1] Yorseh and Morel are Nola Title’s sole members. At the district court hearing on Yorsch’s request for a | preliminary injunction, Yorseh testified that, around 2008, Nola Title entered into the market of offering closing and title insurance services for tax sale properties. According to Yorseh, Nola Title dealt with “anything with tax sales in the chain of title” and offered these services to several municipalities, parishes, or jurisdictions. On August 1, 20Í4, Morel and Yorseh formed My Tax *1277 Sale Resources, L.L.C. (“MTSR”), a member-managed limited liability company, of which Morel and Yorsch are the sole members. According to Yorsch, “[MTSR] was set up... for research and vetting of tax-adjudicated properties for—to be able to issue title insurance.”
Due to the procedural posture of this case, the facts were not fully developed in the district court. It is not clear, and we decline to speculate as to, what precipitated the parties’ decision to enter into the Agreement which Yorsch presently seeks to enforce by means of injunction. The record indicates that on July 10, 2015, Yorsch and Morel executed the following agreement:
NON-CIRCUMVENTION AND NON- ' COMPETITION AGREEMENT
This agreement, effective as of July 10, 2015 (the “Effective Date”), is by and between Stephen D. Morel and Frederick E. Yorsch. The parties hereto are hereinafter at times collectively referred to as the “Members” and.each referred to as a “Member”, [sic]
RECITALS
WHEREAS, the Members are the members of Nola Title Company, LLC (“Nola Title”) and My Tax Sale Resources, LLC (“MTSR”) hereinafter, the “Companies”;
WHEREAS, the Companies have entered into a business arrangement with Archon ■ Information Systems/Civic Source (“Civic Source”), whereby the Companies shall handle the issuance of the policies and the closing for tax adjudicated real estate for Orleans Parish, St. Landry Parish, St. Mary Parish, St. Bernard Parish, Tangipahoa Parish, City of Gretna, City of Bogalusa, More-house Parish, East Carroll Parish, Point Coupee Parish and City of New Iberia, as well as have right of first refusal to -conduct and/or, within a reasonable period of time establish to CivicSource [sic] the Companies’ ability to perform such professional services in any other location. The Companies also intend to provide title insurance for secondary sales • | aand/or refinances of adjudicated properties (hereinafter, the “Business”);
WHEREAS, thé Companies intend to enter into an agreement with Civic Source regarding both the Business and the exploration and pursuit of the Business in other parishes of Louisiana or other states with respect to the handling of the sales, closings and title policy issuances for tax adjudicated real estate (the “Opportunity”);
WHEREAS the Members agree to not circumvent or compete against the Companies with respect to the Business or the Opportunity.
NOW THEREFORE, in consideration of the mutual promises set forth herein, the Parties hereto agree as follows:
1. Non-Circumvention: Both Members hereby agree not to circumvent the Companies in any dealings regarding the Business or the Opportunity with any title insurance companies, including without limitation WFG National Title Insurance Company, or with any government municipalities, parishes, or counties; and each of the Members will not in any manner, except on behalf of the Companies, access, contact, solicit and/or communicate with such parties or accept any business, support, investment, or involvement from such parties or enter into any arrangement or transaction with such parties with respect to such matters, without the other Member’s express written consent or other Member’s direct involvement.
2. Non-Competition. [sic] Except with the express written consent of the other Member, neither Member shall directly ' or indirectly perform any of the follow *1278 ing activities: work for, manage, operate, control, engage or participate in (whether as a principal, agent, representative, proprietor, member, consultant, partner or employee), or engage or invest in, own, manage, operate, finance, control or participate in the ownership, management, operation, financing or control of, be employed by or associated with, or render services or advice or other aid to, or guarantee any obligation of, any person or entity engaged in any business whose activities.compete in any way with the Business or the Opportunity. Each of the Members acknowledges that the Companies conduct the Business in the following parishes in the State of Louisiana: Orleans Parish, St. Landry Parish, St. Mary Parish, St. Bernard Parish, Tangipahoa Parish, City of Gretna, City of Bogalusa, More-house Parish, East Carroll Parish, Point Coupee Parish and City of New Iberia (collectively, the “Covered Parishes”), and accordingly, the restrictions contained herein shall apply to the Covered Parishes. Members shall amend the Covered Parishes, as needed, to include the Business in other parishes and counties obtained by the Opportunity.
3. Period of Effectiveness: The term of this agreement will commence on the Effective Date and continue with respect to each Member for as long as such Member holds an ownership interest in either of the Companies and for a period of two years thereafter.
|44. Remedies: Damages, Injunctions and Specific Performance: The Members expressly understand and agree that the covenants and agreements to be rendered and performed under this agreement are special, unique and are extraordinary in character, and in the event of any default, breach or threatened breach by a Member of this agreement, the other Member shall have the following rights and remedies, each of which shall be independent of the other and severally enforceable, and all of which shall be in addition to and not in lieu of any other rights and remedies available to such Member: (a) such Member shall have the right to have any of [sic] any covenant or agreement specifically enforced without the necessity of proving irreparable injury and without the necessity to post bond or other security; (b) such Member shall have the right to recover direct damages (but not any indirect, punitive, special or consequential damages or loss of profit); and (c) such Member shall have the right to enjoin the breach of such covenants and agreements.
5. Applicable Law: This agreement will be governed by and construed in accordance with the laws of the State of Louisiana.
6. Miscellaneous: If any term or provision of the agreement, or the application thereof to any person or circumstance, shall at any time or to any extent be invalid, illegal or unenforceable in any respect as written, the Members intend for any court construing this agreement to modify or limit such provision temporally, spatially or otherwise so as to render it valid and enforceable to the fullest extent allowed by law. Any such provision which is not susceptible of such reformation shall be ignored so as to not affect any other term or provision hereof, and the remainder of this agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid, illegal or unenforceable, shall not be affected thereby and each term and provision of this agreement shall be valid and enforced to the fullest extent permitted by law. All terms, conditions, covenants, warranties, representations, *1279 agreements, undertakings and obligations hereunder (and under all documents executed herewith) are binding upon and inure to the benefit of the Members hereto and their legal representatives, successors and permitted assigns. No Member may assign or transfer any interest in or obligation under this agreement without the prior written consent of the other Member. No consent or waiver, express or implied, by either Member to or of any breach of default by the other Member in the performance of this agreement may be construed as consent or waiver to or for any subsequent breach or default in the performance by such other party of the same or any other obligations hereunder. This agreement supersedes any other agreement between the Members prior to the date hereof regarding the subject matter hereof. This agreement may be executed in counterparts and all will be considered part of one agreement on all parties hereto. Delivery of an executed counterpart of this agreement by telefacsimile or electronic mail shall be equally as effective as delivery of the original executed counterpart of this agreement.
J¿N WITNESS WHEREOF, the Members have caused this Agreement to be executed as of the Effective Date.
There is no dispute that both Morel and Yorsch signed this Agreement.
Just over a year later, on August 9, 2016, Yorsch filed a “Verified Petition for Temporary Restraining Order, Preliminary Injunction and Permanent Injunction” in the Twenty-Fourth Judicial District Court,[2] petitioning the district court to
enjoin, restrain and/or prevent defendant Stephen Morel through a temporary restraining order, preliminary injunction and permanent injunction from (1) engaging in any business or activity for Arehon/CivicSource, CivicSource Title, LLC, US National Title Insurance Company, and any and all affiliated companies; (2) soliciting and/or targeting NOLA Title’s clients with whom Mr. Morel did business and/or whom he may have solicited while actively engaged in NOLA Title business activities; (3) soliciting, inducing, recruiting, or causing another person in the employ of NOLA Title and/or MTSR to work for Ar-chon/CivicSource, CivicSource Title, LLC, US National Title Insurance Company, and any and all affiliated companies;' and (4) divulging any of NOLA Title’s confidential and trade secret information, including but not limited, to the MTSR vetting process utilized by NOLA Title.
On August 26, 2016, the district court held a hearing on Yorsch’s request for a preliminary injunction. Yorsch testified about the merits of his request for injunc-tive relief, alleging his entitlement to a preliminary injunction because Morel, in violation of the Agreement, has become employed by CivicSource—which Yorsch *1280 maintains is currently a direct competitor of the Companies. In response, Morel’s counsel argued that the Agreement was not enforceable as a matter of law because it is overly broad and violates Louisiana’s strong public policy disfavoring agreements not to compete.
| lAfter' ruling from the bench as a matter of law that the Agreement was not enforceable, the district court issued a written judgment on August 30, 2016. .On September 7, 2016, the Court issued written reasons for judgment, finding the language of the Agreement to be “impermissi-bly broad”: ■
The Non-Circumvention and the Non-competition paragraphs attempt to prohibit the defendant from performing any type of work imaginable for any other business whose activities compete in. any way with the “Business” or “Opportunity.” The Agreement does not just limit the prohibition to defendant’s work that he actually performed for NOLA Title. It prohibits him from working in any capacity for certain persons and entities. Furthermore, it does not just prohibit-the defendant from working to issue title policies in certain parishes. It prohibits him from doing anything for any person or entity that competes in any way with the handling of title insurance and closings for tax adjudicated real estate by NOLA Title and MTSR.
The district court further found that the Agreement also effectively contained, no territorial restrictions as required- by La. R.S. 23:921:
[T]he definition of “Opportunity” clearly fails to comply with La. R.S. 23:921 in that it fails to specify parishes or municipalities. Moreover, while the definition of “Business” specifies certain parishes and municipalities, after specifying these locations, it continues to define the “Business” as a right of first refusal to conduct such -professional services “in any other location.” Thus, it essence [sic]; the Agreement at issue contains no territoriaLlimitation. It prohibits the defendant from doing any type work for any person or company that competes in any way with the right of first refusal -held by NOLA Title and MTSR to handle the title insurance and closings for tax adjudicated real estate -in any location. This type of prohibition is not valid under La. R.S. 23:921(0).
Finally, the district court declined to reform the Agreement. Citing Summit Inst. for Pulmonary Med. & Rehabilitation v. Prouty, 29,829 (La. App. 2 Cir. 4/9/97), 691 So.2d 1384, the district court emphasized that courts have declined to reform non-competition agreements to comply with the statute when reformation would involve amending an ambiguously broad provision to the outer limits of the law. Moreover, the court found that reformation is at odds with the jurisprudential rule that such agreements must be strictly construed against the party attempting to enforce the prohibition.
[7On September 9, 2016, Yorsch timely filed a notice of devolutive appeal, and the district court signed an order granting him a devolutive appeal on the same day.
DISCUSSION
Yorsch raises three assignments of error before this Court. First, he argues that the district court erred in finding the non-competition clause invalid on the basis that the language of the clause is impermissibly broad. Next, Yorsch contends that the district court erred when it declined to reform the non-competition- clause pursuant to an. apparent severability clause contained in the Agreement. Finally, Yorsch maintains that - the district court erred when it denied all injunctive relief without considering the validity of, and the relief *1281 requested, under the non-circumvention clause.
In response, Morel filed exceptions of no cause of action, no right of action, and res judicata to Yorsch’s demand for reformation, arguing that this Court should prohibit Yorsch from raising the issue of reformation because Yorsch did not specifically plead reformation in the district court. Because we find that this Agreement cannot be reformed sufficiently to make it enforceable under the law, we deny Morel’s exceptions as moot.

Standard of Review

The parties disagree about the standard of review applicable to this case. While Morel submits that this Court reviews the denial of a preliminary injunction for clear abuse of discretion, H20 Hair, Inc. v. Marquette, 06-930 c/w 07-18 (La. App. 5 Cir. 5/15/07), 960 So.2d 250, 259, Yorsch argues that the district court’s’judgment must be reviewed de novo as the issue at the heart of the district court’s judgment was one of contract interpretation or application of law. W. Carroll Health Sys., L.L.C. v. Tilmon, 47,152 (La. App. 2 Cir. 5/16/12), 92 So.3d 1131, 1137.
| ^Generally, a trial court is granted wide discretion in deciding whether to grant or deny an injunction, and its ruling will not be disturbed absent manifest error. Century 21 Richard Berry & Assocs. v. Lambert, 08-668 (La. App. 5 Cir. 2/25/09), 8 So.3d 739, 742. However, the merits of Yorsch’s entitlement to injunctive relief are not before us. Rather, the only issue before this court is the district court’s application of. La. R.S. 23:921 to the Agreement. Where the trial court’s decision is based on an erroneous interpretation or application of law, rather than a valid exercise of .discretion, such an incorrect decision is not entitled to deference by the reviewing court. W. Carroll Health Sys., L.L.C., 92 So.3d at 1137; Herff Jones Inc. v. Girouard, 07-393 (La. App. 3 Cir. 10/3/07), 966 So.2d 1127, 1133. Accordingly, we review this question of law de novo.

Assignment of Error 1: The Breadth of the Non-Competition Clause

In his first assignment of error, Yorsch argues that the district court erred in finding the non-competition clause to be im-permissibly broad. Citing Pattridge v. Starks, 50,135 (La. App. 2 Cir. 11/18/15), 181 So.3d 192, 197-98, Yorsch contends that the public policy restricting ñon-com-pete agreements does not apply in this case because -the Agreement at issue is “a bilateral contract between (2) businessmen who decided together that they should both bind themselves to the Agreement.” Moreover, Yorsch argues that the Agreement is not overly broad because it “merely restricts the Members from competing with Companies in the narrow field of tax adjudicated closing and title insurance.” According to Yorsch, the non-competition clause’s prohibition against “engag[ing] in any business whose activities compete in any way with the Business or the Opportunity” does not render the entire non-compete clause unenforceable because “[b]e-yond closing and title insurance services for tax adjudicated properties, the Agreement does not suggest that the Companies engage in any other business.”
laAs ‘ a matter of public policy, Louisiana law disfavors non-competition agreements. This policy is based on the state’s desire to prevent an individual from contractually depriving himself of the ability to support himself and consequently becoming a public burden. Restored Surfaces, Inc. v. Sanchez, 11-529 (La. App. 5 Cir. 12/28/11), 82 So.3d 524, 527; H20 Hair, Inc. v. Marquette, 960 So.2d at 258.
Yorsch argues, as an initial matter, that the public policy concerns of La. R.S. *1282 23:921 do not apply to this case because Yorsch and Morel are sophisticated parties, the Agreement is bilateral, and the parties are on equal footing as members of the' Companies. As such, Yorsch submits that La. R.S. 23:921 should not be applied “as strictly” in this context. For support, Yorsch cites Pattridge v. Starks, 181 So.3d at 197-98, a recent case from the Second Circuit.
Pattridge lends no support to Yorsch’s argument. In Pattridge, the Second Circuit considered a non-compete agreement executed between a shareholder and a corporation. The sole issue before the court concerned which version of La. R.S. 23:921 applied to the case—the law in effect in 2004, which did not include a shareholder-corporation exception to the general prohibition against non-competition agreements or the law in effect in 2008, which did expressly authorize, with certain specified restrictions, non-competition agreements between shareholders and corporations. Pattridge, 181 So.3d at 196. The parties did not dispute that if the 2008 version of the law applied, the agreement at issue was enforceable. Id. at 197. Interpreting the language of the non-competition agreement, the Second Circuit concluded that the parties intended for the law as amended in 2008 to apply. Id. Nevertheless, the court also found that, if the 2004 version of the law applied, the outcome of the case would have been the same—the agreement would have been enforceable because it would have fallen outside of the scope of La. R.S. 23:921 and, thus, the general prohibition would not have applied at all:
| ] (Regardless of the label attached to Edwards at the time of signing, ie. shareholder or employee, it is clear that the policy considerations of La. R.S. 23:921 do not apply in this case. The public policy restricting non-compete agreements is based upon an underlying state desire to prevent an individual from contractually depriving himself of the ability to support himself and consequently becoming a public burden. SWAT 24 [Shreveport Bossier, Inc. v. Bond, 00-1695 (La. 6/29/01), 808 So.2d 294, 298]. Previous to the 2008 amendment, the form of the contract and the label attached to the individual were treated as immaterial when determining the applicability of La. R.S. 23:921. The pertinent inquiry included considering if the parties are on equal footing, if the terms are fair for all parties, the amount of control over any one party, the circumstances under which the contract was executed, and the effect on the individual’s right to engage freely in his occupation after termination. Louisiana Smoked Products, Inc. v. Savoie’s Sausage & Food Products, Inc., 1996-1716 (La. 07/01/97), 696 So.2d 1373, 1380. Pri- or to 2008, Louisiana courts generally held that non-compete agreements that were not employment in nature were outside the scope of Title 23. See Louisiana Smoked Products, supra; Winston v. Bourgeois, Bennett, Thokey & Hickey, 432 So.2d 936 (La. App. 4th Cir. 1983). The 2008 amendment clearly brought those named business entities under the umbrella of La. R.S. 23:921.
Pattridge, 181 So.3d at 197-98. In short, the court determined that, under the 2004 version of La. R.S. 23:921, the agreement at issue would have been enforceable because the restrictions set forth in La. R.S. 23:921 would not have applied.
We discern several problems with the application of Pattridge to this case. Contrary to Yorsch’s assertion, Pattridge does not support the conclusion that La. R.S. 23:921 should not be applied “as strictly” in the context of a bilateral agreement between sophisticated parties on equal footing. First, Pattridge does not purport to apply La. R.S. 23:921 less “strictly.” The *1283 point of law underlying the portion of Pat-tridge which Yorsch highlights has to do not with the construction of La. R.S. 23:921 in a context in which the statute certainly applies but with the question of whether the statute applies at all.[3] While Yorsch heavily emphasizes 1 nthe Pattridge court’s discussion about, among other things, whether the parties entering into the contract are on equal footing and whether the terms were fair to all parties, see Pattridge, 181 So.3d at 198, Pattridge and the cases upon with Pattridge rely, see Louisiana Smoked Prods. v. Savoie’s Sausage & Food Prods., 96-1716 c/w 96-1727 (La. 7/1/97), 696 So.2d 1373, 1379-81; Winston v. Bourgeois, Bennett, Thokey & Hickey, 432 So.2d 936 (La. App. 4 Cir. 1983), concern whether or not the provisions of La. R.S. 23:921 apply when the courts discern some ambiguity as to whether the scope of the statute extends to a particular context.[4] Because the parties do not dispute that La. R.S. 23:921 applies to the Agreement executed between Yorsch and Morel,[5] the inquiries into the *1284 | ^bargaining powers and sophistication of each party to the bilateral agreement are irrelevant.
Second, Yorseh points to the Pattridge court’s statement that “the policy considerations of La. R.S. 23:921 do not apply” in the case of shareholder and corporation non-compete agreements. 181 So.3d at 197-98. We believe this statement is taken out of context, The entirety of the paragraph containing the referenced statement concerns the state of the law in 2004, prior to the 2008 amendments adding La. R.S. 23:921(J), (K), and (L), which explicitly provide limited exceptions for shareholder and corporation non-competition agreements, partner and partnership non-competition agreements, and limited liability company and member non-competition agreements. While the Second Circuit may have questioned whether or not the La. R.S. 23:921 encompassed these types of agreements prior to the 2008 amendments, the court acknowledges at the end of the paragraph Yorseh cites that “[t]he 2008 amendment clearly brought those named business .entities under the umbrella of La. R.S. 23:921.” Pattridge, 181 So.3d at 198.
Nevertheless, the primary reasons Yorsch’s argument on this score fails is that it is contrary to the plain language of the statute. This Court has repeatedly recited the rule that non-compete agreements must be strictly construed'against the party seeking them enforcement. Restored Surfaces, 82 So.3d at 527; H20 Hair, 960 So.2d at 259. However, this rule is not solely jurisprudential in nature as it is grounded in the plain language of La. R.S. 23:921(A)(1), which contains the general prohibition against non-competition agreements and acknowledges that there are certain exceptions to this general rule:
Every contract or agreement, or provision thereof, by which anyone -is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this • Section, shall be null and void. However, every contract or agreement, or provision thereof, which meets the exceptions as provided in this Section, shall be ■ enforceable.
1 i.qThe statute itself demands strict construction as only those agreements which meet “the exceptions as provided in this Section” shall be enforceable. All others “shall be null and void.” La. R.S. 23:921(A)(1). Because we discern no ambiguity in this statute, we must apply it as written. La. Civ. Code art. 9.
We turn now to the language of the statute itself. Both Yorseh and Morel agree that La. R.S. 23:921(L) sets forth the exception—from the general prohibition laid out in La. R.S. 23:921(A)(1)—that is applicable to this Agreement:
A limited liability company and the individual members of such limited liability company may agree that such members will refrain from carrying on or engaging in a business similar to that of the limited liability company and from soliciting customers of the limited liability company within a specified parish or parishes, municipality or municipalities, or parts thereof, for as long as the limit *1285 ed liability company carries on a similar business therein, not to exceed a period of two years from the date such member ceases to be a member. A violation of this Subsection shall be enforceable in accordance with Subsection H of this Section.
La. R.S. 23:921(L). Thus, for a non-competition or non-solicitation agreement to pass muster under La. R.S. 23:921(L), the scope of the agreement must be confined to an agreement (1) to “refrain from carrying on or engaging in a business similar to that of the limited liability company and from soliciting customers of the limited liability company” (2) “within a specified parish or parishes, municipality or municipalities, or parts thereof,” (3) “for as long as the limited liability company carries on a similar business therein, not to exceed a period of two years from the date such member ceases to be a member.” In short, the statute limits (1) the scope of the activity from which one agrees to refrain, (2) the geographic area in which one agrees to refrain from that activity, and (3) the time period during which this agreement to refrain from the specified activity may be effective.
The non-competition clause of the Agreement provides:
Non-Competition. Except with the express written consent of the other Member, neither Member shall directly or ■ indirectly perform any of the following activities: work for, manage, operate, control, engage or participate in (whether as a principal, agent, representative, | ^proprietor, member, consultant, partner or employee), or engage or invest in, own, manage, operate, finance, control or participate in the ownership, management, operation, financing or control of, be employed by or.associated with, or render services or advice or other aid to, or guarantee any obligation of, any person or entity engaged in any business whose activities compete in any way with the Business or the Opportunity. Each of the Members acknowledges that the Companies conduct the Business in the following parishes in the State of Louisiana: Orleans Parish, St, Landry Parish, St. Mary Parish, St. Bernard Parish, Tangipahoa Parish, City of Gret-na, City of Bogalusa, Morehouse Parish, East Carroll Parish, Point Coupee Parish and City of New Iberia (collectively, the “Covered Parishes”), and accordingly, the restrictions contained herein shall apply to the Covered Parishes. Members shall amend the Covered Parishes, as needed, to include the Business in other parishes and counties obtained by the Opportunity.
The words “Business” and “Opportunity” are terms defined earlier in the’Agreement:
WHEREAS, the Companies have entered into a business arrangement with Archon Information, Systems/Civic Source (“Civic Source”), whereby the Companies shall handle the issuance of the policies and the closing for tax adjudicated real estate for Orleans Parish, St. Landry Parish, St. Mary Parish, St. Bernard Parish, Tangipahoa Parish, City of Gretna, City of Bogalusa, More-house Parish, East Carroll Parish, Point Coupee Parish and City of New Iberia, as well as have right of first refusal to conduct and/or, within a reasonable period of time establish to CivicSource [sic] the Companies’ ability to perform such professional services in any other location. The Companies also intend to provide title insurance for secondary sales and/or refinances of adjudicated properties (hereinafter, the “Business”);
WHEREAS, the Companies intend to enter into an agreement with Civic Source regarding both the Business and *1286 the exploration and pursuit of the Business in other parishes of Louisiana or other states with respect to the handling of the sales, closings and title policy issuances for tax adjudicated real estate (the “Opportunity”)....
Yorsch argues that this Agreement “merely restricts the Members from competing with the Companies in the narrow field of tax adjudicated closing and title insurance” and that “the Agreement does not suggest that the Companies engage in any other area of business.” Accordingly, Yorsch maintains that the non-competition clause is enforceable. We disagree.
No Louisiana appellate court has interpreted La. R.S. 23:921(L), which became effective on August 15, 2008. See Acts 2008, No. 399 § 1. The starting 11fipoint for the interpretation of any statute is the language of the statute itself. Cat’s Meow, Inc. v. City of New Orleans, 98-0601 (La. 10/20/98), 720 So.2d 1186, 1198. When a law is clear and unambiguous, and its application does not lead to absurd consequences, it shall be applied as written, with no further interpretation made in search of the legislative intent. La. Civ. Code. art. 9.
The plain language of this statute clearly leads to the conclusion that this non-competition clause is impermissibly broad. While La. R.S. 23:921(L) permits members to enter into an Agreement to “refrain from carrying on or engaging in a business similar to that of the limited liability company,” the Agreement prohibits the members from, among other things, “directly or indirectly...working] for,.. .be[ing] employed by or associated with, or rendering] services or advice or other aid to, or guaranteeing] any obligation of, any person or entity engaged in any business whose activities compete in any way with the Business or the Opportunity.” While the Agreement’s definitions of “Business” and “Opportunity” seem at first blush to be confined to “the issuance of the policies and the closing for tax adjudicated real estate” and provision of “title insurance for secondary sales and/or refinances of adjudicated properties,” it would be wrong to consider these definitions in isolation as the non-competition clause, incorporating these definitions, broadens the scope of the activities the members are prohibited from performing. Given the breadth of the non-competition clause, it is not difficult to imagine prohibited activities that are far afield from the statute’s requirement that the restraint involve “business similar to that of the limited liability company.” La. R.S. 23:921(L). For example, under the non-competition clause, a member could not “render services or advice or other aid to... any person or entity engaged in any business whose activities compete in any way with the Business or the Opportunity.” As we interpret this clause, not only would a member be prohibited from working in a completely unrelated capacity for ajjjjcompany “whose activities compete in any way with the Business or the Opportunity,” but the clear terms of the clause would also prohibit a member from “render[ing] services” to any person “engaged in any business whose activities compete in any way with the Business or the Opportunity.” The breadth of this prohibition is so far-reaching that Morel could not get a job babysitting for an employee of a company that competes in any way with the “Business” or the “Opportunity.” Under the terms of this agreement, if Morel decided to open a crawfish business, he could not cater the company crawfish boil of a firm that competes in any way with the “Business” or the “Opportunity,” because he would be “render[ing] services” to a competing entity. The enforcement of this provision would certainly prohibit Morel from engaging in the practice of real estate law—or white collar crime, for that matter—at a large local law firm if one of the *1287 partners at that firm had any business that competed in any way with the “Business” or the “Opportunity.” Although the Agreement defines the “Business” and the “Opportunity” in a fairly limited way, the non-competition clause drives a freight train through this limitation, barring a member from engaging in myriad other occupations that are not “similar to that of the limited liability company,” in derogation of La. R.S. 23:921(L).
We also find that the non-competition clause fails to adequately specify the geographic scope of the restraint, as required by La. R.S.23:921(L). Because “Business” is defined to include “the right of first refusal to conduct and/or, within a reasonable period of time establish to [Civic Source] the Companies’ ability to perform such professional services in any other location,” enforcement of the non-competition clause, which incorporates this definition of “Business,” would mean Morel, or any person or entity he worked for, could be competing with “the Business” wherever he worked.
| ^Accordingly, we find that the non-competition clause does not meet the exception to La. R.S. 23:921(A)(1) that is set forth in La. R.S. 23:921(L). Therefore, this portion of the Agreement is null and void. La. R.S. 23:921(A)(1). This assignment of error is meritless.

Assignment of Error 2: Reformation of the Non-Competition Agreement

Yorsch maintains that, to the extent the geographical boundaries of the non-competition agreement were too broad, the district court erred when it declined to reform the non-competition clause. Because we also find that the non-competition clause is overly broad in the scope of restricted activities, we need not address plaintiffs contentions that the district court erred when it determined that clause was also unenforceable because it did not contain clear geographical boundaries.

Assignment of Error 3: The Non-Circumvention Agreement

Yorsch argues that the district court erred in denying all injunctive relief because the Agreement also contained a non-circumvention clause which the court should have enforced. Yorsch contends that the restrictions applicable to non-competition agreements do not apply to non-circumvention agreements. Thus, the district court, applying principles of contract law, should have enforced the non-circumvention portion of the Agreement by granting Yorsch’s request for a preliminary injunction. We disagree.
The non-circumvention clause provides:
N on-Circumvention: Both Members hereby agree not to circumvent the Companies in any dealings regarding the Business or the Opportunity with any title insurance companies, including without limitation WFG National Title Insurance Company, or with any government municipalities, parishes, or counties; and each of the Members will not in any manner, except on behalf of the Companies, access, contact, solicit and/or communicate with such parties or accept any business, support, investment, or involvement from such parties or enter into any arrangement or transaction with such parties with | ^respect to such matters, without the other Member’s express written consent or other Member’s direct involvement.
Although this provision is styled a “Non-Circumvention” clause, in substance, this clause is a non-solicitation agreement. A non-solicitation agreement is separate and apart from a non-competition agreement. The requirements of La. R.S. 23:921 apply to non-solicitation agreements, as well as non-compete agreements. Creative Risk *1288 Controls, Inc. v. Brechtel, 01-1150 (La. App. 5 Cir. 4/29/03), 847 So.2d 20, 25, writ denied, 03-1769 (La. 10/10/03), 855 So.2d 353. Thus, to be valid, a non-solicitation agreement must also meet the requirements of La. R.S. 23:921. Id.
We find that this non-circumvention clause is unenforceable because it does not contain a geographic limitation as required by La. R.S. 23:921(L). While the Agreement does contain a severability clause, we find that the non-circumvention clause is not susceptible to reformation. La. R.S. 23:921(L) requires that the parish or parishes, municipalities or municipalities, or parts thereof, be “specified.” When this requirement is combined with the statutory and jurisprudential requirement that we strictly construe the exceptions to La. R.S. 23:921(A)(1), we find that the non-circumvention clause is unenforceable. The only portion of the Agreement that contains a geographic limitation—albeit an overly broad geographic limitation, as discussed above—is the non-competition clause. While geographical limits may be inferred from the limits of the non-compete clauses in non-competition agreements, we decline to reform the non-solicitation clause pürsu-ant to the severability clause in favor of Yorsch. Because La. R.S; '23:921(L) requires specificity regarding geographical limitations and La. R.S. 23:921(A)(1) prohibits such agreements “except as provided in this Section,’* the non-circumvention’ clause must be able to stand on its own. See Vartech Sys. v. Hayden, 05-2499 (La. App. 1 Cir. 12/20/06), 951 So.2d 247, 260-61.
| Accordingly, this assignment of error is meritless. '
DECREE
Accordingly, we affirm the district court’s judgment denying Yorsch’s request for a preliminary injunction, and we deny as moot Morel’s exceptions of no cause of action, no right of action, and res judicata concerning Yorsch’s demand for reformation of the contract.
AFFIRMED

. According to Morel’s affidavit, which the district court admitted into evidence at the hearing on Yorsch’s request for a preliminary injunction, Nola Title was originally formed as a manager-managed limited liability company but was, thereafter, formally changed to a member-managed limited liability company.

. In its reasons for judgment, the district court explained that the instant case is one of several related lawsuits arising out of Yorsch and Morel’s business relationship. According to the district court, a lawsuit to liquidate the parties’ multiple jointly owned companies is pending in Division J of the Twenty-Fourth Judicial District Court under Case Number 759-985. Additionally, CivicSource, a company with which Nola Title had a business service agreement, filed a lawsuit in Civil District Court for Orleans Parish, alleging breach of contract. Likewise, Nola Title filed a lawsuit in Civil District Court for Orleans Parish against a number of defendants, including CivicSource and Morel, alleging, among other things, breach of fiduciary duty and breach of the non-circumvention and non-competition agreement at issue in this matter.

.Both of the other cases Yorsch cites in his reply brief also deal not with the construction of La. R.S. 23:921 but with its application at all in a then-novel context. See Sentilles v. Kwik-Kopy Corp., 94-1553 (La. App. 4 Cir. 2/23/95), 652 So.2d 79; McCray v. Blackburn, 236 So.2d 859 (La. App. 3 Cir. 1970). This line of cases seems to stem from fact that La. R.S. 23:921 originally applied only in the context of employer and employee relationships, see Acts 1962, No. 104, §§ 1, 2 ("No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another...”), but was later amended in 1989 to encompass, with certain specified exceptions, "[e]very contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade or business of any kind...Acts 1989, No. 639, § 1. Despite this amendment, some Louisiana courts—as evidenced by Sentilles which declined to apply the 1989 version of La. R.S. 23:921 to a franchisor-franchisee agreement—continued to interpret the statute as if it only applied in the context of employer and employee relationships. Sentilles, 652 So.2d at 81 (“The public policy of Louisiana, both prior to 1934 and later, as expressed in R.S. 23:921, has always been to prohibit (or severely restrict) non-competition agreements between employers and employees.”). Although the Sentilles court refused to apply La. R.S. 23:921, the court interestingly recognized that in 1991 the Legislature amended La. R.S. 23:921, setting forth an "exception” to the general prohibition for non-competition agreements between franchisors and franchisees under certain specified circumstances. Evidently, the Sentilles court concluded that the existence of an exception does not prove the rule.

. Indeed, Louisiana Smoked Products involved a non-competition agreement between two corporations. Because the statute did not explicitly reference non-competition agreements between corporations and because the Supreme Court found the statute to be ambiguous on this point, the Court considered various factors, including “whether all concerned are bound equally to the covenant” and "whether the terms are fair to each party in all respects,” in order to determine whether the Legislature intended to include such agreements within the scope of the statute's general prohibition against non-competition agreements. Louisiana Smoked Products, 696 So.2d at 1379-80. This case offers an excellent background discussion of the history of the statute from its enactment in 1934 up until the time then-Justice Johnson authored the opinion for the Court in 1997.

. The parties agree that La. R.S 23:921(L) applies to this agreement. La. R.S. 23:921(L) specifies the circumstances under which "[a] limited liability company and the individual members of such limited liability company may agree that such members” can enter into non-competition and non-solicitation agree- ' ments. Although the limited liability companies, Nola Title and MTSR, were not explicitly parties to this Agreement, as the sole members of these limited liability companies, both Yorsch and 'Morel had the authority to act as "a mandatary of the limited liability company for all matters in the ordinary course of its business other than the alienation, lease, or *1284 encumbrance of its immovables, unless such mandate is restricted or enlarged in the articles of organization,” La. R.S. 12:1317. Yorseh and Morel both executed this Agreement in their capacities as members of the Conxpanies. Thus, solely fqr the purposes of .determining the applicability of La. R.S. 23:921(L), the Companies were a party to this Agreement. Because we find this Agreement to be.unenforceable, however, this determination is of little consequence because, if La. R.S. 23:921(L) does not apply then, pursuant to La. R.S. 23 ¡921(A)(1), the Agreement would likewise be “null and void" ,as it. does not meet the requirements of any other section of the statute.